**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MERRY A. KOGUT, derivatively on behalf of CAMPING WORLD HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MARCUS A. LEMONIS, THOMAS E. KIRN, MATTHEW D. WAGNER, ANDRIS A. BALTINS, BRIAN P. CASSIDY, MARY J. GEORGE, KATHLEEN S. LANE, MICHAEL W. MALONE, BRENT L. MOODY, and K. DILLON SCHICKLI, <br><br> Defendants, <br><br> and <br><br> CAMPING WORLD HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: 1:26-cv-05914 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT;** <br> **(4) ABUSE OF CONTROL;** <br> **(5) GROSS MISMANAGEMENT; AND** <br> **(6) WASTE OF CORPORATE ASSETS** <br><br> JURY TRIAL DEMANDED |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Merry A. Kogut ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Camping World Holdings, Inc. ("Camping World" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Marcus A. Lemonis ("Lemonis"), Thomas E. Kirn ("Kirn"), Matthew D. Wagner ("Wagner"), Andris A. Baltins ("Baltins"), Brian P. Cassidy ("Cassidy"), Mary J. George ("George"), Kathleen S. Lane ("Lane"), Michael W. Malone ("Malone"), Brent L. Moody ("Moody"), and K. Dillon Schickli ("Schickli'), (collectively, the "Individual Defendants," and together with Camping

1

World, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Camping World, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Wagner, Lemonis, and Kirn under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Camping World, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Camping World directors and officers from April 29, 2025 to February 24, 2026, inclusive (the "Relevant Period").

2.     Camping World is a Delaware corporation headquartered in Illinois, which claims to be the world's largest retailer of recreational vehicles ("RVs") and related products and services. The Company operates in two segments: Good Sam Services and Plans, and RV and Outdoor Retail.

3.     The Good Sam Services and Plans segment consists of programs, plans, and services designed to protect, insure, and promote the RV and travel lifestyles to their customer

base. Services under this segment include: extended vehicle service contracts, vehicle roadside assistance, property and casualty insurance, program protection, travel planning and directories, and publications.

4. The Company's RV and Outdoor Retail segment focuses its operations on all aspects of RV dealership. Such operations include: selling new and used RVs, assisting with financing new and used RVs, selling protection and insurance related services and plans for RVs, servicing and repairing new and used RVs, installing RV parts and accessories, and selling RV and outdoor related products, parts, and accessories.

5. During the Relevant Period, the Company expressed its plan to manage its vast inventory through the use of advanced data analytics. The Company also touted the retail demand it was experiencing for new and used vehicles. However, throughout the Relevant Period the Individual Defendants failed to convey the true nature of the Company's inventory management capabilities and recent experience in the marketplace. More specifically, the Individual Defendants reassured investors of the quality and the stability of the Company's operations and ability to rely on advanced data collection practices to guarantee optimal performance in the marketplace.

6. For instance, on July 29, 2025, the Company issued a press release to announce its financial and operational results for the second quarter of 2025 ended June 30, 2025 (the "Q2 2025 Press Release"), which it also filed on Form 8-K with the SEC. The Q2 2025 Press Release quoted Defendant Lemonis, who stated the following regarding the Company's inventory management, in relevant part:

> *We continue to surgically manage our inventory to find volume and gross profit opportunities leveraging our new and used supply chains, our contract manufacturing relationships, our sophisticated data analytics, and the strength of our balance sheet to put the right inventory on the ground at the right time and*

*the right price*.[1]

7. The truth would not fully emerge until February 24, 2026, when the Company issued a press release announcing the Company's financial results for the fourth quarter and full year of 2025 (the "Q4 2025 Press Release"). The Q4 2025 Press Release revealed the Company suffered significant net losses, decrease in gross profit, failure to reach the target 300-400 basis point improvement to the selling, general, and administrative expenses ("SG&A")as a percentage of gross profit, and a variety of other reasonably concerning results.

8. On this news, the price per share of Camping World's stock fell $1.79, or 16.5%, from a closing price of $10.85 per share on February 24, 2026 to close at $9.06 per share on February 25, 2026.

9. During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

10. Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Camping World, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) the Company's ability to maximize profits by "surgically manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and

---

[1] Unless stated otherwise, all emphasis herein is added.

(v) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its current Chief Executive Officer ("CEO") and President, its Chief Financial Officer ("CFO"), and its former CEO and controlling shareholder to a federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, a majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Camping World. Plaintiff has continuously held Camping World stock since first purchasing shares on March 14, 2022.

### Nominal Defendant Camping World

20.     Camping World is a Delaware corporation with its corporate headquarters located at 2 Marriott Drive, Lincolnshire, IL 60069. Camping World's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CWH."

### Defendant Lemonis

21. Defendant Lemonis previously served as the Chairman of the Board and CEO of Camping Holdings from March 2016 and September 2006, respectively, before ultimately stepping down in January 2026. Following this, Defendant Lemonis assumed the position of Special Advisor. According to the Company's Schedule 14A filed with the SEC on April 4, 2025 (the "2025 Proxy Statement"), as of March 27, 2026, Defendant Lemonis held 33,235,716 shares of the Company's Class A common stock and 32,584,700 shares of the Company's Class B common stock, providing Defendant Lemonis with 52.4% voting power over. Thus, Defendant Lemonis is the controlling shareholder of the Company.

22. The 2025 Proxy Statement stated the following about Defendant Lemonis, in relevant part:

> Marcus A. Lemonis has served as Camping World Holdings, Inc.'s Chairman and Chief Executive Officer and on the Board of Directors of Camping World Holdings, Inc. since March 2016, as the President and Chief Executive Officer and on the Board of Directors of CWGS, LLC since February 2011, as the Chief Executive Officer and on the Board of Directors of Good Sam Enterprises, LLC since January 2011, as President and Chief Executive Officer and on the Board of Directors of Camping World, Inc. since September 2006 and as the President and Chief Executive Officer and on the Board of Directors of FreedomRoads, LLC ("FreedomRoads") since May 1, 2003. Mr. Lemonis has also served on the Board of Directors of Beyond, Inc., an e-commerce retailer, since October 2023, including as Executive Chair since December 2023, and has served as its Principal Executive Officer since March 2025. Mr. Lemonis received a B.A. from Marquette University. Mr. Lemonis' extensive experience in retail, RV and automotive, business operations and entrepreneurial ventures makes him well qualified to serve on our Board of Directors.

> *       *       *

> Pursuant to the terms of the Voting Agreement, Marcus A. Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, and certain funds controlled by Crestview Partners II GP, L.P., in the aggregate, have more than 50% of the voting power for the election of directors, and, as a result, we are considered a "controlled company" for the purposes of the NYSE listing requirements.

**Defendant Kirn**

7

23. Defendant Kirn is CFO of Camping World, serving in this role since July 2024. Prior to this position, Defendant Kirn served as Camping World's Chief Accounting Officer from September 2020 until assuming the position of CFO.

24. The Governance page of Camping World's website[2] states the following about Defendant Kirn:

> Thomas E. Kirn has served as Camping World Holdings, Inc.'s Chief Financial Officer since July 2024. Mr. Kirn previously served as Chief Accounting Officer from September 2020 to July 2024, and as Chief Financial Officer for FreedomRoads, LLC, an indirect subsidiary of Camping World Holdings, Inc., from September 2019 to September 2020. Prior to joining FreedomRoads, Mr. Kirn held various roles at Ernst & Young, LLP from 2009 to 2019, including as Assurance Senior Manager from 2017 to 2019 and Assurance Manager from 2014 to 2017. Mr. Kirn received a B.A. degree in Accounting and a B.A. degree in Hispanic Studies from Illinois Wesleyan University.

**Defendant Wagner**

25. Defendant Wagner has served as CEO of the Company and as a Company director since January 2026. He has also been the President of the Company since July 2024. Previously, Defendant Wagner served various roles at the Company dating back to 2007.

26. The Company's Schedule 14A filed with the SEC on April 9, 2026 (the "2026 Proxy Statement") stated the following about Defendant Wagner:

> Matthew D. Wagner has served as Camping World Holdings, Inc.'s Chief Executive Officer, President, and as a member of the Board of Directors since January 1, 2026. Mr. Wagner previously served as President from July 2024 to December 2025 and as Chief Operating Officer from January 2023 to June 2024. Prior to these roles, he served as Executive Vice President from August 2019 to December 2022 and Senior Vice President, Sales, Marketing, and Corporate Development from December 2018 to August 2019. Mr. Wagner originally joined the Company in 2007 as an intern and held various leadership positions within the organization and its subsidiaries, including Vice President of Inventory Operations for FreedomRoads, LLC from May 2016 to December 2018. He received a B.S. degree in Finance and Operations and Supply Chain Management from Marquette University. Mr. Wagner's extensive industry experience and leadership as our

---

[2] https://investor.campingworld.com/governance/default.aspx?section=management

Chief Executive Officer and President make him well qualified to serve on our Board of Directors.

**Defendant Baltins**

27. Defendant Baltins has served as a Company director since March 2016. He also serves as Chair of the Compensation committee and as a member of the Nominating and Corporate Governance Committee.

28. The 2026 Proxy Statement stated the following about Defendant Baltins:

Andris A. Baltins has served on the Board of Directors of Camping World Holdings, Inc. since March 2016, on the Board of Directors of CWGS, LLC since February 2011 and on the Board of Directors of Good Sam Enterprises, LLC since February 2006. He has been a member of the law firm of Kaplan, Strangis and Kaplan, P.A. since 1979. Mr. Baltins serves as a director of various private and nonprofit corporations. Mr. Baltins previously served as a director of Polaris Industries, Inc. from 1995 until 2011. Mr. Baltins received a J.D. from the University of Minnesota Law School and a B.A. from Yale University. Mr. Baltins' over 40-year legal career as an advisor to numerous public and private companies and his experience in the areas of complex business transactions, mergers and acquisitions and corporate law make him well qualified to serve on our Board of Directors.

**Defendant Cassidy**

29. Defendant Cassidy has served as a Company director since March 2016. He also serves as a member of the Compensation Committee.

30. The 2026 Proxy Statement stated the following about Defendant Cassidy:

Brian P. Cassidy has served on the Board of Directors of Camping World Holdings, Inc. since March 2016 and on the Board of Directors of CWGS, LLC since March 2011. Mr. Cassidy is the president and a partner at Crestview, which he joined in 2004, and currently serves as head of Crestview's media and communications strategy. Mr. Cassidy currently serves as a director of Pursuit Attractions and Hospitality Inc., since August 2020, and has served as a director of various private companies, including Saber Interactive since September 2024, Journey Beyond since July 2024, FC3 since November 2020, Digicomm since August 2020, Hornblower Holdings since April 2018, Congruex LLC since November 2017, and WideOpenWest, Inc. since December 2015. Mr. Cassidy previously served as a director of Cumulus Media, Inc., a public company, from May 2014 until March 2017, served as a director of various private companies, including Industrial Media

9

from October 2016 to February 2022, ICM Partners from December 2019 to June 2022, NEP Group, Inc. from December 2012 to October 2018, Interoute Communications Holdings from April 2015 until May 2018, OneLink Communications from May 2007 until November 2012 and ValueOptions, Inc. from December 2007 until December 2014, and served as chairman of TenCate Grass from September 2021 to February 2024. He was also involved with Crestview's investments in Charter Communications, Inc. and Insight Communications, Inc. Prior to joining Crestview, Mr. Cassidy worked in private equity at Boston Ventures, where he invested in companies in the media and communications, entertainment and business services industries. Previously, he worked as the acting chief financial officer of one of Boston Ventures' portfolio companies. Prior to that time, Mr. Cassidy was an investment banking analyst at Alex. Brown & Sons, where he completed a range of financing and mergers and acquisitions assignments for companies in the consumer and business services sectors. Mr. Cassidy received an M.B.A. from the Stanford Graduate School of Business and an A.B. in Physics from Harvard College. Mr. Cassidy's private equity investment and company oversight experience and background with respect to acquisitions, debt financings and equity financings make him well qualified to serve on our Board of Directors.

**Defendant George**

31.     Defendant George has served as a Company director since January 2017, and serves as the Lead Independent Director. Defendant George also serves as a member of the Compensation Committee.

32.     The 2026 Proxy Statement stated the following about Defendant George:

Mary J. George has served on the Board of Directors of Camping World Holdings, Inc. since January 2017. Since January 2022, Ms. George has also served on the board of ASP Conair Holdings LP, owner of Conair Corporation, a private U.S.-based company that sells small appliances, personal care, and health and beauty products. She has also served on the board of Hyduro, Inc., a private company and developer of a mobile connected smart water bottle cap, designed to optimize personal hydration by providing timely feedback, since March 2022. Ms. George also served as executive chairman of Ju-Ju-Be, a private company and retailer of premium diaper bags and other baby products from January 2018 to September 2022. Ms. George has been a founding partner of Morningstar Capital Investments, LLC, an investment firm, since 2001. Ms. George served as chief executive officer and a director at Easton Hockey Holdings Inc., a private manufacturer of ice hockey equipment, from August 2014 to December 2016. From 2002 to 2015, Ms. George held various positions, including co-chairman (2002 to 2009) and vice chairman (2009 to 2015), at Bell Automotive Products, Inc., a private manufacturer of automotive accessories. From 1994 to 2004, Ms. George held various positions,

including chief operating officer (1995 to 1998), chief executive officer (1998 to 2000), and chairman (2000 to 2004), at Bell Sports Inc., a formerly public helmet manufacturer. Ms. George previously served as a director of various public and private companies, including Image Entertainment, Inc., a formerly public independent distributor of home entertainment programming, from 2010 to 2012, Oakley, Inc., a public sports equipment and lifestyle accessories manufacturer, from 2004 to 2007, BRG Sports Inc. since 2013, 3 Day Blinds Inc. from 2007 to 2015, and Oreck Corporation from 2008 to 2012. Ms. George's experience in sales, marketing and general management in the consumer products industry, as well as success in the development of internationally renowned branded products, provides our Board of Directors with greater insight in the areas of product branding and strategic growth in the consumer products industry, and make her well-qualified to serve on our Board of Directors.

**Defendant Lane**

33. Defendant Lane has served as a Company director since March 2024. Defendant Lane also serves as a member of the Audit Committee.

34. The 2026 Proxy Statement stated the following about Defendant Lane:

Kathleen S. Lane has served on the Board of Directors of Camping World Holdings, Inc. since March 2024. Ms. Lane served as the Chief Information Officer at TJX Companies, a multinational off-price department store corporation, from 2008 to 2013. She also served as Chief Information Officer at National Grid, a multi-national electricity and gas provider for commercial and residential applications from 2006 to 2008. She has also had a breadth of experience within the consumer products industry, having started her career at The Proctor & Gamble Company. Ms. Lane then served as Chief Information Officer at GE Oil & Gas in Florence, Italy from 2000 to 2002, as Chief Information Officer at Gillette and as director, technology services of Pepsi Cola International. She has served on the Board of Directors of Hanover Insurance Group, Inc., an insurance company, since September 2018. Ms. Lane previously served as a director of Bob Evans Farms, Inc., a publicly traded operator of over 500 restaurants and a producer and distributer of food products, from 2014 to 2018, Armstrong Flooring, Inc., a formerly publicly traded leading global producer of flooring products, from 2016 to 2023, and EarthLink Holdings, LLC, a managed network, security and cloud services provider, from 2013 to 2017. Ms. Lane has served as a trustee and on the finance committee of Hebrew SeniorLife, a nonprofit organization, since 2022. Ms. Lane's experience in retail industries and as a Chief Information Officer provides our Board of Directors with valuable expertise in key focus areas and makes Ms. Lane well qualified to serve on our Board of Directors.

**Defendant Malone**

35. Defendant Malone has served as a Company director since May 2019. Defendant

Malone also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the Audit Committee.

36.     The 2026 Proxy Statement stated the following about Defendant Malone:

Michael W. Malone has served on the Board of Directors of Camping World Holdings, Inc. since May 2019. Mr. Malone was Vice President, Finance and Chief Financial Officer of Polaris Industries Inc. ("Polaris"), a manufacturer of power sports vehicles, from January 1997 to July 2015 and retired from Polaris in March 2016. From January 1997 to January 2010, Mr. Malone also served as Corporate Secretary. Mr. Malone was Vice President and Treasurer of Polaris from December 1994 to January 1997 and was Chief Financial Officer and Treasurer of a predecessor company of Polaris from January 1993 to December 1994. Mr. Malone joined Polaris in 1984 after four years with Arthur Andersen LLP. Mr. Malone has served on the board of Don Stevens, LLC, a private company, since May 2021. Previously, Mr. Malone served on the board and on the Audit (chair), Finance and Nominating and Governance Committees of Armstrong Flooring, Inc., a formerly publicly traded leading global producer of flooring products, from 2016 to 2023. Mr. Malone also served on the board of Stevens Equipment Supply LLC, a private company, from 2011 to 2020, as well as the boards of various nonprofit organizations. Mr. Malone received a B.A. in accounting and business administration from St. John's University (Collegeville, Minnesota). Mr. Malone's experiences as the former Chief Financial Officer of a public company, his public company board experience, and his in-depth knowledge of the outdoor lifestyle industry make him well qualified to serve on our Board of Directors.

**Defendant Moody**

37.     Defendant Moody is the Chairman of the Board and has served as a Company director since May 2018. Defendant Moody previously worked for Camping World since 2002, most recently serving as President of the Company from September 2018 to June 2024.

38.     The 2026 Proxy Statement stated the following about Defendant Moody:

Brent Moody has served as Camping World Holdings, Inc.'s Chairman of the Board of Directors since January 1, 2026 and as a member of the Board of Directors of Camping World Holdings, Inc. since May 2018. Mr. Moody previously served as a Senior Advisor to Camping World Holdings, Inc. from July 1, 2024 through December 31, 2024, as President of Camping World Holdings, Inc. and President of CWGS Enterprises, LLC from September 2018 to June 30, 2024, as Camping World Holdings, Inc.'s Chief Operating and Legal Officer from March 2016 to September 2018, as the Chief Operating and Legal Officer of CWGS, LLC and its subsidiaries since January 2016, as the Executive Vice President and Chief Administrative and Legal Officer of CWGS, LLC from February 2011 to December

31, 2015, as the Executive Vice President and Chief Administrative and Legal Officer of Good Sam Enterprises, LLC from January 2011 to December 2015, as the Executive Vice President and Chief Administrative and Legal Officer of FreedomRoads, LLC and Camping World, Inc. from 2010 until December 2015, as Executive Vice President/General Counsel and Business Development of Camping World, Inc. and FreedomRoads, LLC from 2006 to 2010, as Senior Vice President/General Counsel and Business Development of Camping World, Inc. and Good Sam Enterprises, LLC from 2004 to 2006 and as Vice President and General Counsel of Camping World, Inc. from 2002 to 2004. From 1998 to 2002, Mr. Moody was a shareholder of the law firm of Greenberg Traurig, P.A. From 1996 to 1998, Mr. Moody served as vice president and assistant general counsel for Blockbuster, Inc. In addition, Mr. Moody currently serves on the Board of Directors for Court Appointed Special Advocates (CASA) Lake County, a non-profit entity, and the Board of Governors for Shepard Broad Law School, Nova Southeastern University. Mr. Moody received a J.D. from Nova Southeastern University, Shepard Broad Law Center and a B.S. from Western Kentucky University. Mr. Moody's extensive legal experience, his experience in various areas of complex business transactions and mergers and acquisitions, and his extensive knowledge of the Company's operations make him well qualified to serve on our Board of Directors.

### Defendant Schickli

39. Defendant Schickli has served as a Company director since March 2016. He also serves as a member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee.

40. The 2026 Proxy Statement stated the following about Defendant Schickli:

K. Dillon Schickli has served on the Board of Directors of Camping World Holdings, Inc. since March 2016 and on the Board of Directors of CWGS, LLC since August 2011. Mr. Schickli previously served on the Board of Directors of CWGS, LLC from 1990 until 1995 and was chief operating officer of Affinity Group, Inc., the predecessor of Good Sam Enterprises, LLC, from 1993 until 1995. Previously, Mr. Schickli was a co-investor with Crestview in DS Waters Group, Inc. ("DS Waters") and served as vice chairman of its board of directors until it was sold to Cott Corporation in December 2014. Prior to that time, Mr. Schickli was the chief executive officer of DS Waters from June 2010 until February 2013 and subsequently led the buyout of the business by Crestview. Mr. Schickli also previously led the buyout of DS Waters from Danone Group & Suntory Ltd. in November 2005 and was also a co investor in DS Waters with Kelso & Company. Mr. Schickli served as co-chief executive officer and chief financial officer of DS Waters from November 2005 until June 2010, when he became the sole chief executive officer. Mr. Schickli started his business career in the capital planning

and acquisitions group of the Pepsi Cola Company after he received his M.B.A. from the University of Chicago. Mr. Schickli received a B.A. from Carleton College in 1975. Mr. Schickli's long association with, and knowledge of, the Company, extensive experience serving as a director of other businesses, operating experience as a chief executive officer and chief financial officer and his experience as a private equity investor with respect to acquisitions, debt financings, equity and financings make him well qualified to serve on our Board of Directors

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41. By reason of their positions as controlling shareholder, officers, and/or directors of Camping World and because of their ability to control the business and corporate affairs of Camping World, the Individual Defendants owed Camping World and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Camping World in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Camping World and its shareholders so as to benefit all shareholders equally.

42. Each controlling shareholder, director, and officer of the Company owes to Camping World and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43. The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Camping World, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

44. To discharge their duties, the controlling shareholder, officers, and directors of Camping World were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45. Each Individual Defendant, by virtue of his or her position as a controlling

14

shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Camping World, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Camping World Board at all relevant times.

46. As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

47. To discharge their duties, the controlling shareholder, officers, and directors of Camping World were required to exercise reasonable and prudent supervision over the

management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Camping World were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Camping World's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Camping World conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Camping World and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Camping World's operations would comply with all applicable laws and Camping World's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to Camping World and the shareholders the duty of loyalty requiring that each favor Camping World's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Camping World and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, directorial, and controlling positions with Camping World, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Camping World.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Camping World was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Camping World and was at all times acting within the course and scope of such agency.

## CAMPING WORLD'S CODE OF CONDUCT

57.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct")

states that it "applies to all of [its] directors, officers and other employees." The purpose of the

Code of Conduct is to provide all employees and directors with "general guidelines for conducting

the business of the Company consistent with the highest standards of business ethics."

58. The Code of Conduct provides, in a subsection titled "Waivers of the Code" that:

Any waiver of this Code for our directors, executive officers or other principal financial officers may be made only by our Board of Directors and will be disclosed to the public as required by law or the rules of the New York Stock Exchange, when applicable. Waivers of this Code for other employees may be made only by our Chief Executive Officer or Chief Administrative and Legal Officer and will be reported to our Audit Committee.

59. The Code of Conduct provides, in a section titled "Conflicts of Interest," in relevant

part:

A. Identifying Potential Conflicts of Interest
Employees and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.
Identifying potential conflicts of interest may not always be clear-cut. The following situations might reasonably be expected to give rise to a conflict of interest and should be identified to, and addressed by, the Chief Administrative and Legal Officer or the Board of Directors:
• Outside Employment. An employee or director being employed by or serving as a director of a company that the individual knows or suspects is a material customer, supplier or competitor of the Company (other than services to be provided as part of an employee's or director's job responsibilities for the Company).
• Improper Personal Benefits. An employee or director obtaining any material (as to him or her) personal benefits or favors because of his or her position with the Company. Please see "Gifts and Entertainment" below for additional guidelines in this area.
• Financial Interests. An employee or director having a "material interest" (ownership or otherwise) in any company that the employee or the director knows or suspects is a material customer, supplier or competitor of the Company and using his or her position to influence a transaction with such company. Whether an employee or director has a "material interest" will be determined by the Chief Administrative and Legal Officer or the Board of

19

Directors, as applicable, in light of all of the circumstances, including consideration of the relationship of the employee or the director with the customer, supplier or competitor, the relationship of the employee or the director to the specific transaction and the importance of the interest to the employee or the director having the interest.

(Emphasis in original).

60.    The Code of Conduct provides, in a section titled "Corporate Opportunities," that:

Except as provided in the Company's certificate of incorporation, as an employee or director of the Company, you have an obligation to advance the Company's interests when the opportunity to do so arises.  If you discover or are presented with a corporate opportunity in the Company's line of business as to which the Company would have an interest or expectancy through the use of corporate property or information or because of your position with the Company and the corporate opportunity is expressly offered to you solely in your capacity as an employee or director of the Company, you should first present the corporate opportunity to the Company before pursuing the opportunity in your individual capacity. No employee or director may use corporate property, information or his or her position with the Company for personal gain or compete with the Company while employed by us.

You should disclose to your supervisor the terms and conditions of each business opportunity covered by this Code that you wish to pursue.  Your supervisor will contact the Company's Chief Administrative and Legal Officer and the appropriate management personnel to determine whether the Company wishes to pursue the business opportunity.  If the Company waives its right to pursue the business opportunity, you may pursue the business opportunity on the same terms and conditions as originally proposed and consistent with the other ethical guidelines set forth in this Code.

61.    The Code of Conduct provides, in a section titled "Company Records," that:

Accurate and reliable records are crucial to our business.  Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning.  Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects.  Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control.  Please contact your supervisor or the Company's Chief Administrative and Legal Officer to obtain a copy of any such policy or with any

questions concerning any such policy.

62. The Code of Conduct provides, in a section titled "Accuracy of Financial Reports and Other Public Communications" that:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

63. The Code of Conduct provides, in a section titled "Compliance with Laws and Regulations," in pertinent part:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, approval, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's Chief Administrative and Legal Officer.

64. The Code of Conduct provides, in a section titled "Public Communications and Regulation FD" that:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts,

Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company to analysts, institutional investors or representatives of the media.

For more information on the Company's policies and procedures regarding public communications and compliance with Regulation FD, please contact the Company's Chief Administrative and Legal Officer for a copy of the Company's Policy Regarding Communications with Analysts, Securityholders and Others or with any questions you may have about disclosure matters.

65.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violation of the Exchange Act. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**CAMPING WORLD's AUDIT COMMITTEE CHARTER**

66.     The Company's Audit Committee Charter states that the purpose of the Audit Committee is to:

22

[A]ssist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the performance of the internal audit function.

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

67. The Audit Committee Charter outlines the responsibilities of the Audit Committee, which include:

*Interaction with the Independent Auditor*

\* \* \*

2. *Annual Report on Independence and Quality Control.* The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

*Annual Financial Statements and Annual Audit*

3. *Audit Problems.* The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial

statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7. *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. *Risk Assessment and Risk Management.* The Committee must discuss the Company's policies with respect to risk assessment and risk management, including information security matters and risks, including reviewing information technology procedures and controls and receiving periodic briefings, no less than annually, from senior management on information security matters, including data privacy and cyber-security.

(Emphasis in original).

68. In violation of the Audit Committee Charter, Defendants Lane, Malone, and Schickli conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Lane, Malone, and Schickli failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

69. Camping World is a Delaware corporation headquartered in Lincolnshire, Illinois. The Company holds itself out as world's largest retailer of RVs and related products and services. The Company operates in two segments: Good Sam Services and Plans, and RV and Outdoor Retail.

70. The Good Sam Services and Plans segment purportedly aims to protect, insure, and promote the RV and travel lifestyles to their customer base through the designing of programs, plans, and services. Services under this segment include: extended vehicle service contracts, vehicle roadside assistance, property and casualty insurance, program protection, travel planning and directories, and publications.

71. The Company's RV and Outdoor Retail segment focuses its operations on all aspects of RV dealership. Such operations include selling new and used RVs, assisting with financing new and used RVs, selling protection and insurance related services and plans for RVs, servicing and repairing new and used RVs, installing RV parts and accessories, and selling RV and outdoor related products, parts, and accessories.

### False and Misleading Statements

#### April 29, 2025 Press Release

72. The relevant period began on April 29, 2025. That day, the Company released its financial results in a press release for the first quarter of 2025 ended March 31, 2025 (the "Q1 2025 Press Release"), which it also filed on Form 8-K with the SEC. The Form 8-K was signed by Defendant Kirn.

73. The Q1 2025 Press Release highlighted the Company's financial results, declaring that the Company remained "confident in [its] guideposts to deliver growth in excess of low-

25

double digits in used units and low single digits in new units, vehicle gross margins within our

historical range and SG&A as a percentage of gross profit improving by 600-700 basis points."

74. The Q1 2025 Press Release stated, in relevant part:

Matthew Wagner, President of CWH commented, "Our business continues to exhibit consistent growth in real time. *We remain confident in our guideposts to deliver growth in excess of low-double digits in used units and low single digits in new units, vehicle gross margins within our historical range* and SG&A as a percentage of gross profit improving by 600-700 basis points. We continue to meet the customer where they want to be met in terms of price and payment, leading to slightly lower than anticipated ASPs to start the year. We are rigorously managing our SG&A as we aim to mitigate any ASP or macroeconomic variability that could persist in the near-term."

**First Quarter-over-Quarter Operating Highlights**

- Revenue was $1.4 billion for the first quarter, an increase of $49.5 million, or 3.6%.

- New vehicle revenue was $621.4 million for the first quarter, a decrease of $34.7 million, or 5.3%, and new vehicle unit sales were 16,726 units, a decrease of 156 units, or 0.9%. Used vehicle revenue was $422.4 million for the first quarter, an increase of $84.7 million, or 25.1%, and used vehicle unit sales were 13,939 units, an increase of 3,245 units, or 30.3%. Combined new and used vehicle unit sales were 30,665, an increase of 3,089 units, or 11.2%.

\* \* \*

- Gross profit was $429.6 million, an increase of $27.2 million, or 6.8%, and total gross margin was 30.4%, an increase of 89 basis points. The gross profit increase was mainly driven by the $19.2 million higher used vehicle gross profit from the increase in used vehicle unit sales and gross margin as discussed above and $13.2 million higher finance and insurance, net ("F&I") gross profit largely from the 11.2% increase in combined new and used vehicle unit sales and new F&I offerings. The gross margin improvements for used vehicles and products, service and other discussed above were partially offset by a 511 basis point decrease in Good Sam Services and Plans gross margin to 61.6%, which was primarily a result of higher roadside assistance claim costs.

- Selling, general and administrative expenses ("SG&A") were $387.4 million, an increase of $16.0 million, or 4.3%. This increase was primarily driven by a $9.6 million increase in employee cash compensation costs, $7.3 million of additional advertising expenses, and a $2.0 million increase in employee stock-based compensation ("SBC") expense, partially offset by $4.2 million of

reduced legal fees. SG&A Excluding SBC(2) was $380.3 million, an increase of $13.9 million, or 3.8%.

*    *    *

| | Three Months Ended March 31, | | Increase | Percent |
|---|---|---|---|---|
| | 2025 | 2024 | (decrease) | Change |
| Unit sales | | | | |
| New vehicles | 16,726 | 16,882 | (156) | (0.9%) |
| Used vehicles | 13,939 | 10,694 | 3,245 | 30.3% |
| Total | 30,665 | 27,576 | 3,089 | 11.2% |
| | | | | |
| Average selling price | | | | |
| New vehicles | $ 37,154 | $ 38,863 | $ (1,709) | (4.4%) |
| Used vehicles | 30,300 | 31,577 | (1,277) | (4.0%) |
| | | | | |
| Same store unit sales(1) | | | | |
| New vehicles | 15,791 | 16,116 | (325) | (2.0%) |
| Used vehicles | 13,157 | 10,239 | 2,918 | 28.5% |
| Total | 28,948 | 26,355 | 2,593 | 9.8% |
| | | | | |
| Same store revenue(1) ($ in 000s) | | | | |
| New vehicles | $ 587,456 | $ 628,813 | $ (41,357) | (6.6%) |
| Used vehicles | 398,862 | 321,354 | 77,508 | 24.1% |
| Products, service and other | 139,506 | 149,776 | (10,270) | (6.9%) |
| Finance and insurance, net | 141,129 | 130,144 | 10,985 | 8.4% |
| Total | $ 1,266,953 | $ 1,230,087 | $ 36,866 | 3.0% |
| | | | | |
| Average gross profit per unit | | | | |
| New vehicles | $ 5,086 | $ 5,393 | $ (307) | (5.7%) |
| Used vehicles | 5,624 | 5,531 | 93 | 1.7% |
| Finance and insurance, net per vehicle unit | 4,848 | 4,912 | (64) | (1.3%) |
| Total vehicle front-end yield(2) | 10,179 | 10,359 | (180) | (1.7%) |

***April 30, 2025 Earnings Call***

75.     The following day, April 30, 2025, the Company held an earnings call to discuss the financial results for the three-month period ended March 31, 2025 (the "Q1 2025 Earnings Call").

76.     During the Q1 2025 Earnings Call, Defendant Lemonis noted the Company's commitment to ambitious SG&A reductions to "improve [its] margins and reduce [its] costs." Defendant Lemonis went on to emphasize the Company's "proper inventory planning, proper stocking," and "very healthy balance sheet[.]"

27

77. Specifically, during the Q1 2025 Earnings Call, Defendant Lemonis stated, in relevant part:

Thanks, Lindsey. Good morning, and welcome to our first quarter 2025 earnings call. We entered the year with a few simple mandates: sell more RVs, *improve our margins and reduce our costs. As part of that, we made a commitment to deliver for the 2025 year, an improvement of SG&A as a percentage of growth by 600 to 700 basis points*.

\*     \*     \*

We've taken decisive action on SG&A and craft preservation during the first quarter, the primary benefits of which we expect to show up in the second half of the year through the balance of the year so we may achieve our goal.

\*     \*     \*

[S]o we're particularly [ ] committed to pushing things through the system and growing market share in 2025. *But we're doing it responsibly by proper inventory planning, proper stocking and a real collaboration around making sure that there's efficiency* for both companies. I think as we look at the margin profile, it's clear that we didn't need to be overly promotional. Our new margins continue to be quite frankly in line with our historical levels, even though we know competitors have actually gotten far more aggressive. We haven't had to do that.

\*     \*     \*

It's the same thing we've said from day one. *We have a very healthy balance sheet as Tom evidenced between cash, used inventory that we own free and clear*, parts that we own free and clear, real estate that we own free and clear and available revolvers both on the floor plan and in other areas.

78. During the Q1 Earnings Call, Defendants Wagner and Kirn similarly emphasized the Company's "laser focus[]" on balancing inventory supply and demand, requiring "record levels of used inventory procurement," which benefitted the Company's used vehicle gross margins. Defendant Wagner stated, in relevant part:

Thanks, Marcus. Our momentum in new and used unit sales has extended far beyond March with April to date used same-store unit sales up high teens and with new unit sales up high single digits. We again reached record levels of combined new and used unit market share, seeing it over 14% through February.

28

Importantly, we continue to maintain a high degree of velocity within our used RV supply chain, helping to fuel our significant used sales momentum. ***We achieved record levels of used inventory procurement in March and we are on pace to set another record in April. This laser focused effort ensures we have an adequate supply of used inventory to sustain our comps into the peak selling season***.

79.     In his own statements, Defendant Kirn stated:

Thanks, Matt. For the first quarter, we recorded revenue of $1.4 billion, an increase of 4% driven primarily by a 30% increase in used unit sales. ***Used vehicle gross margins of 18.6% continued to exhibit year-over-year improvement as we aggressively brought fresh inventory back into the system***.

***May 1, 2025 Form 10-Q Filing***

80.     On May 1, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 (the "Q1 2025 Form 10-Q"). The Q1 2025 Form 10-Q was signed by Defendant Kirn and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lemonis and Kirn attesting to the accuracy of the Q1 2025 Form 10-Q and that "the financial statements, and other financial information included in [the Q1 2025 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company.]"

81.     The Q1 2025 Form 10-Q affirmed the previously reported data included in the Q1 2025 Press Release.

82.     The Q1 2025 Form 10-Q provided further statements including that the Company has "increase[ed] the procurement of used vehicles, which resulted in a 25.1% increase in used vehicle revenue[.]" Following this, Q1 2025 Form 10-Q stated, "[a]ccordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025."

83.     The Q1 2025 Form 10-Q stated as follows, in relevant part:

We had experienced lower used vehicle inventory levels for much of 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. ***Beginning in the fourth quarter of 2024, we***

29

*took steps to reverse the trend of decreasing used vehicle revenue and unit sales, including the increase in the procurement of used vehicles, which resulted in a 25.1% increase in used vehicle revenue and 30.3% increase in used vehicle unit sales in the first quarter of 2025. Accordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025.*

\*     \*     \*

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 20,916 | $ 208,422 | $ 29,718 |
| Contracts in transit | 149,113 | 61,222 | 154,231 |
| Accounts receivable, net | 118,800 | 120,412 | 100,246 |
| Inventories | 2,119,169 | 1,821,837 | 2,077,592 |
| Prepaid expenses and other assets | 74,418 | 58,045 | 68,833 |
| Assets held for sale | 20,536 | 1,350 | 6,276 |
| Total current assets | 2,502,952 | 2,271,288 | 2,436,896 |
| | | | |
| Property and equipment, net | 886,244 | 846,760 | 878,956 |
| Operating lease assets | 749,177 | 739,352 | 768,903 |
| Deferred tax assets, net | 210,586 | 215,140 | 197,484 |
| Intangible assets, net | 18,520 | 19,469 | 12,998 |
| Goodwill | 747,802 | 734,023 | 735,680 |
| Other assets | 31,929 | 37,245 | 36,013 |
| Total assets | $5,147,210 | $ 4,863,277 | $5,066,930 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 250,884 | $ 145,346 | $ 205,006 |
| Accrued liabilities | 160,711 | 118,557 | 148,674 |
| Deferred revenues | 89,084 | 92,124 | 95,854 |
| Current portion of operating lease liabilities | 65,653 | 61,993 | 60,663 |
| Current portion of finance lease liabilities | 7,646 | 7,044 | 19,014 |
| Current portion of Tax Receivable Agreement liability | 1,700 | — | 12,943 |
| Current portion of long-term debt | 23,147 | 23,275 | 25,651 |
| Notes payable – floor plan, net | 1,320,687 | 1,161,713 | 1,414,696 |
| Other current liabilities | 74,129 | 70,900 | 72,783 |
| Total current liabilities | 1,993,641 | 1,680,952 | 2,055,284 |

\*     \*     \*

| | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2025 | | 2024 |
| Revenue: | | | | |
| Good Sam Services and Plans | $ | 46,208 | $ | 45,681 |
| RV and Outdoor Retail | | | | |
| New vehicles | | 621,432 | | 656,086 |
| Used vehicles | | 422,351 | | 337,685 |
| Products, service and other | | 164,992 | | 177,894 |
| Finance and insurance, net | | 148,667 | | 135,454 |
| Good Sam Club | | 9,874 | | 11,217 |
| Subtotal | | 1,367,316 | | 1,318,336 |
| Total revenue | | 1,413,524 | | 1,364,017 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | | | |
| Good Sam Services and Plans | | 17,721 | | 15,183 |
| RV and Outdoor Retail | | | | |
| New vehicles | | 536,359 | | 565,039 |
| Used vehicles | | 343,961 | | 278,533 |
| Products, service and other | | 84,739 | | 101,675 |
| Good Sam Club | | 1,116 | | 1,190 |
| Subtotal | | 966,175 | | 946,437 |
| Total costs applicable to revenue | | 983,896 | | 961,620 |
| Operating expenses: | | | | |
| Selling, general, and administrative | | 387,445 | | 371,473 |
| Depreciation and amortization | | 22,544 | | 19,290 |
| Long-lived asset impairment | | 620 | | 5,827 |
| (Gain) loss on sale or disposal of assets | | (1,823) | | 1,585 |
| Total operating expenses | | 408,786 | | 398,175 |
| Income from operations | | 20,842 | | 4,222 |
| Other expense: | | | | |
| Floor plan interest expense | | (18,306) | | (27,882) |
| Other interest expense, net | | (30,531) | | (36,094) |
| Other expense, net | | (158) | | (94) |
| Total other expense | | (48,995) | | (64,070) |
| Loss before income taxes | | (28,153) | | (59,848) |
| Income tax benefit | | 3,471 | | 9,042 |
| Net loss | | (24,682) | | (50,806) |
| Less: net loss attributable to non-controlling interests | | 12,402 | | 28,499 |
| Net loss attributable to Camping World Holdings, Inc. | $ | (12,280) | $ | (22,307) |

***May 15, 2025 Meeting of Stockholders***

84.     On May 15, 2025 the Company hosted its Annual Meeting of Stockholders (the "Annual Meeting"). Prior to this, on April 4, 2025, the Company issued the 2025 Proxy Statement. The 2025 Proxy Statement was solicited by Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli, pursuant to Section 14(a) of the Exchange Act, and contained materially false or misleading statements.

85.     The 2025 Proxy Statement, the Board solicited shareholders to vote to, *inter alia*: (1) the re-election of Defendants Lemonis, Cassidy, and Malone to the Board; (2) the ratification of the appointment of Deloitte & Touche LLP as the Company's independent registered public

accounting firm; (3) the approval, on an advisory basis, of compensation for named executive officers; (4) the approval of an amendment to the Company's Amended and Restated Certificate of Incorporation exculpating officers from breaches of fiduciary duty to the extent allowable under the General Corporation Law of Delaware; and (5) the approval of an amendment extending the term of the Company's 2016 Incentive Award Plan.

86.     With respect to the Code of Conduct, the 2025 Proxy Statement stated:

We have adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees. A copy of the code is available on our website at *investor.campingworld.com* in the "Governance" section of the "Investor Relations" page. We expect that any amendments to the code, or any waivers of its requirements, that are required to be disclosed by SEC or NYSE rules will be disclosed on our website.

87.     In a section titled "BOARD LEADERSHIP STRUCTURE AND ROLE IN RISK OVERSIGHT," the 2025 Proxy Statement stated, in relevant part:

Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities and the Board and the Board committees have an active role in overseeing management of the Company's risks. The Board will regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Company's Audit Committee oversees management of financial and cybersecurity risks. As part of this oversight, the Audit Committee receives periodic briefings, no less than annually, from senior management on information security matters, including data privacy and cyber-security. The Nominating and Corporate Governance Committee manages risks associated with the Company's corporate governance framework. Our Board is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

88.     Under the direction and watch of Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli, the 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (i) the Company's ability to maximize profits by "surgically

32

manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and (v) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

89.     The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

90.     As a result of material misstatements and omissions, at the Company's Annual Meeting on May 15, 2025, Company shareholders voted to: (1) re-elect Defendants Lemonis, Cassidy, and Malone to serve as directors for another three year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for 2025; (3) approve, on an advisory basis, the compensation for named executive officers for 2025; (4) amend the Company's Amended and Restated Certificate of Incorporation to exculpate officers for breaches of fiduciary duty to the extent permitted under Delaware's General Corporation Law; and (5) amend the Company's 2016 Incentive Award Plan to extend the period the plan would be effective.

*July 29, 2025 Press Release*

91.     On July 29, 2025, the Company released its Q2 2025 Press Release. The Form 8-K was signed by Defendant Kirn.

92.     The Q2 2025 Press Release announced the Company's financial results, specifically highlighting the Company's "margin performance[.]" The Q2 2025 Press Release went on to state that the Company was continuing "to surgically manage [its] inventory to find volume and gross profit opportunities leveraging… sophisticated data analytics and the strength of [its] balance sheet to put the right inventory on the ground at the right time and the right price."

93.     The Q2 2025 Press Release updated the Company's expectations for improvement in SG&A as a percentage of gross profit to 300-400 basis points of improvement. Specifically, the Q2 2025 Press Release stated as follows, in relevant part:

> Marcus Lemonis, Chairman and Chief Executive Officer of CWH stated, "I am unbelievably pleased with our Company's financial performance in the quarter, driven by volume, margin performance and aggressive cost controls. *We continue to surgically manage our inventory to find volume and gross profit opportunities leveraging our new and used supply chains, our contract manufacturing relationships, our sophisticated data analytics, and the strength of our balance sheet to put the right inventory on the ground at the right time and the right price. Our nimbleness is a true testament to the differentiation and durability of our model*."
>
> Mr. Lemonis continued, "We have made structural changes to our fixed costs compared to last year, reducing our headcount by over 900, consolidating 16 locations, and selling 7,818 more units; meaningfully improving our per-rooftop productivity and *proving we can adapt to the near-term ASP contribution margin environment in new vehicles*."
>
> Matthew Wagner, President of CWH commented, "Our same store unit growth trends July month-to-date are tracking up high-teens percent on used vehicles and up high-singles on new vehicles compared to the prior year, both in line on a multi-year basis with our second quarter performance. *Our guideposts for the full year remain largely unchanged, although our new unit volume is now expected to be higher, growing in excess of high-singles compared to the prior year. New vehicle ASP is expected to improve seasonally in the third and fourth quarter but could be lower by 10-12% for the full year compared to the prior year. Despite this drop*

34

*in ASP we are expecting to accomplish 300-400 basis points of improvement in SG&A as a percentage of gross profit[(1)], recognizing that this efficiency will improve further as ASPs rebound.*"

\* \* \*

**Second Quarter-over-Quarter Operating Highlights**

- Revenue was $2 billion for the second quarter, an increase of $169.4 million, or 9.4%

- New vehicle revenue was $915.1 million for the second quarter, an increase of $68.0 million, or 8.0%, and new vehicle unit sales were 26,696 units, an increase of 4,612 units, or 20.9%. Used vehicle revenue was $572.3 million for the second quarter, an increase of $91.5 million, or 19.0%, and used vehicle unit sales were 18,906 units, an increase of 3,206 units, or 20.4%. Combined new and used vehicle unit sales were 45,602, an increase of 7,818 units, or 20.7%.

\* \* \*

- Gross profit was $592.3 million, an increase of $44.6 million, or 8.1%, and total gross margin was 30.0%, a decrease of 34 basis points. The gross profit increase was mainly driven by the $25.9 million higher used vehicle gross profit from the increase in used vehicle unit sales and gross margin as discussed above and $22.2 million increased finance and insurance, net ("F&I") gross profit largely from the 20.7% increase in combined new and used vehicle unit sales and new F&I offerings. The gross margin decrease was primarily from higher roadside assistance claim costs that drove the 777 basis point decrease in Good Sam Services and Plans gross margin to 59.5%, which was mostly offset by improvements for used vehicles and products, service and other discussed above.

- Selling, general and administrative expenses ("SG&A") were $437.5 million, an increase of $17.8 million, or 4.2%. This increase was primarily driven by a $7.5 million increase in employee cash compensation costs, a $3.0 million increase in employee stock-based compensation ("SBC") expense, $2.9 million of additional advertising expenses, and an additional $3.3 million for other outside service providers. SG&A Excluding SBC(3) was $429.1 million, an increase of $14.8 million, or 3.6%.

\* \* \*

| | | Three Months Ended June 30, | | Increase | Percent |
|---|---|---|---|---|---|
| | | 2025 | 2024 | (decrease) | Change |
| **Unit sales** | | | | | |
| New vehicles | | 26,696 | 22,084 | 4,612 | 20.9% |
| Used vehicles | | 18,906 | 15,700 | 3,206 | 20.4% |
| Total | | 45,602 | 37,784 | 7,818 | 20.7% |
| | | | | | |
| **Average selling price** | | | | | |
| New vehicles | $ | 34,279 | $ 38,358 | $ (4,079) | (10.6%) |
| Used vehicles | | 30,269 | 30,623 | (354) | (1.2%) |
| | | | | | |
| **Same store unit sales**[1] | | | | | |
| New vehicles | | 24,360 | 19,936 | 4,424 | 22.2% |
| Used vehicles | | 17,528 | 14,509 | 3,019 | 20.8% |
| Total | | 41,888 | 34,445 | 7,443 | 21.6% |
| | | | | | |
| **Same store revenue**[1] **($ in 000s)** | | | | | |
| New vehicles | $ | 833,171 | $ 768,687 | $ 64,484 | 8.4% |
| Used vehicles | | 525,573 | 448,019 | 77,554 | 17.3% |
| Products, service and other | | 179,017 | 186,445 | (7,428) | (4.0%) |
| Finance and insurance, net | | 186,659 | 163,615 | 23,044 | 14.1% |
| Total | $ | 1,724,420 | $ 1,566,766 | $ 157,654 | 10.1% |
| | | | | | |
| **Average gross profit per unit** | | | | | |
| New vehicles | $ | 4,729 | $ 5,862 | $ (1,133) | (19.3%) |
| Used vehicles | | 6,190 | 5,807 | 383 | 6.6% |
| Finance and insurance, net per vehicle unit | | 4,412 | 4,738 | (326) | (6.9%) |
| Total vehicle front-end yield[2] | | 9,747 | 10,577 | (830) | (7.8%) |
| | | | | | |
| **Gross margin** | | | | | |
| Good Sam Services and Plans | | 59.5% | 67.3% | (777) bps | |
| New vehicles | | 13.8% | 15.3% | (149) bps | |
| Used vehicles | | 20.5% | 19.0% | 149 bps | |
| Products, service and other | | 47.8% | 43.7% | 411 bps | |
| Finance and insurance, net | | 100.0% | 100.0% | unch | |
| Good Sam Club | | 88.1% | 86.8% | 133 bps | |
| Subtotal RV and Outdoor Retail | | 29.1% | 29.2% | (7) bps | |
| Total gross margin | | 30.0% | 30.3% | (34) bps | |

### *July 30, 2025 Earnings Call*

94.     The following day, July 30, 2025, the Company held an earnings call to discuss the financial results for the three-month period ended June 30, 2025 (the "Q2 2025 Earnings Call").

95.     During the Q2 2025 Earnings Call, Defendant Lemonis expressed that he was "happy" with the Company's "nimbleness[,]" "knowledge of inventory[,]" and "ability to act quickly[.]" Defendant Lemonis went on to say these factors have allowed the Company to "put the right kind of inventory on the ground on both the new side and the used side." Specifically, during

the Q2 2025 Earnings Call, Defendant Lemonis stated, in relevant part:

*I'm also happy that with the pressure that we've seen in the general macro environment, our nimbleness and our knowledge of inventory and our ability to act quickly has put the right kind of inventory on the ground on both the new side and the used side.* Customers walk in our front door. We don't try to drive them to 1 specific unit. We try to drive them to a transaction and folks different levels of affordability and different preferences around floor plan and our sales process leads them to a transaction that ends up closing.

I'm also happy to report that our gross margins broke [Technical Difficulty]. So, any idea that we grew our volume on the backs of heavy discounting, that would be false. Earlier in the year, I think probably in January or February, we set a short-term goal of reducing our SG&A by 600 to 700 basis points. Let me be crystal clear. That goal isn't moving. We made a lot of progress in the quarter despite the ASP pressure that the general market gave us.

\*     \*     \*

As we look forward to our capital allocation, and you can see the $118 million of cash on our balance sheet, *the amount of inventory we own free and clear*, the amount of real estate that we own without a mortgage; *our balance sheet, quite frankly, has never been stronger.* So far for the year, we've de-levered a pretty significant amount, and Tom will address that in his results -- in his comments a little later.

96.     In his own remarks, Defendant Wagner stated the following:

And Joe, let's not forget the competitive advantage that we have with our contract manufacturing and our ability to just add additional content features while we even just like had done previous cursory checks of competitors. I mean, we are clearly coming in under invoice pricing based upon OEM brands that are of equivalent products. So, I don't know that I'm seeing any different type of behavior than we normally would experience. *I mean, just as well, we feel like we've played a much more competitive and intelligent game in terms of our inventory management.*

*July 30, 2025 Form 10-Q Filing*

97.     On July 30, 2025, the Company filed its quarterly report for the period ended June 30, 2025 on a Form 10-Q with the SEC (the "Q2 2025 Form 10-Q"). The Q2 2025 Form 10-Q was signed by Defendant Kirn and attached SOX certifications signed by Defendants Lemonis and Kirn attesting to the accuracy of the Q2 2025 Form 10-Q and that "the financial statements, and

37

other financial information included in [the Q2 2025 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company.]"

98. The Q2 2025 Form 10-Q affirmed the previously reported data included in the Q2 2025 Press release when

99. The Q2 2025 Form 10-Q provided further statements including that the Company has "increase[ed] the procurement of used vehicles, which resulted in a 21.5% increase in used vehicle revenue[.]" Following this the Q2 2025 Form 10-Q stated, "[a]ccordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025."

100. The Q2 2025 Form 10-Q stated as follows, in relevant part:

We had experienced lower used vehicle inventory levels for much of 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. ***Beginning in the fourth quarter of 2024, we took steps to reverse the trend of decreasing used vehicle revenue and unit sales, including the increase in the procurement of used vehicles, which resulted in a 21.5% increase in used vehicles revenue and 24.4% increase in used vehicles unit sales in the first half of 2025. Accordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025***.

\* \* \*

|  | June 30, 2025 | December 31, 2024 | June 30, 2024 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 118,084 | $ 208,422 | $ 23,743 |
| Contracts in transit | 163,767 | 61,222 | 165,033 |
| Accounts receivable, net | 137,822 | 120,412 | 128,938 |
| Inventories | 2,061,160 | 1,821,837 | 2,014,444 |
| Prepaid expenses and other assets | 57,974 | 58,045 | 68,220 |
| Assets held for sale | 15,202 | 1,350 | 8,418 |
| Total current assets | 2,554,009 | 2,271,288 | 2,408,796 |
| | | | |
| Property and equipment, net | 910,052 | 846,760 | 856,308 |
| Operating lease assets | 716,020 | 739,352 | 760,143 |
| Deferred tax assets, net | 211,435 | 215,140 | 193,873 |
| Intangible assets, net | 17,602 | 19,469 | 21,354 |
| Goodwill | 748,561 | 734,023 | 731,015 |
| Other assets | 34,168 | 37,245 | 34,387 |
| Total assets | $ 5,191,847 | $ 4,863,277 | $ 5,005,876 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 283,450 | $ 145,346 | $ 260,390 |
| Accrued liabilities | 182,581 | 118,557 | 187,120 |
| Deferred revenues | 94,041 | 92,124 | 99,045 |
| Current portion of operating lease liabilities | 65,488 | 61,993 | 62,795 |
| Current portion of finance lease liabilities | 19,514 | 7,044 | 7,335 |
| Current portion of Tax Receivable Agreement liability | 1,700 | — | 12,277 |
| Current portion of long-term debt | 23,023 | 23,275 | 24,082 |
| Notes payable – floor plan, net | 1,280,102 | 1,161,713 | 1,296,352 |
| Other current liabilities | 79,167 | 70,900 | 80,343 |
| Total current liabilities | 2,029,066 | 1,680,952 | 2,029,739 |

\*　　\*　　\*

39

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Revenue: | | | | |
| Good Sam Services and Plans | $ 54,213 | $ 52,548 | $ 100,421 | $ 98,229 |
| RV and Outdoor Retail | | | | |
| New vehicles | 915,106 | 847,105 | 1,536,538 | 1,503,191 |
| Used vehicles | 572,271 | 480,774 | 994,622 | 818,459 |
| Products, service and other | 222,890 | 235,947 | 387,882 | 413,841 |
| Finance and insurance, net | 201,198 | 179,016 | 349,865 | 314,470 |
| Good Sam Club | 10,270 | 11,115 | 20,144 | 22,332 |
| Subtotal | 1,921,735 | 1,753,957 | 3,289,051 | 3,072,293 |
| Total revenue | 1,975,948 | 1,806,505 | 3,389,472 | 3,170,522 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | | | |
| Good Sam Services and Plans | 21,947 | 17,192 | 39,668 | 32,375 |
| RV and Outdoor Retail | | | | |
| New vehicles | 788,873 | 717,650 | 1,325,232 | 1,282,689 |
| Used vehicles | 455,239 | 389,601 | 799,200 | 668,134 |
| Products, service and other | 116,412 | 132,933 | 201,151 | 234,608 |
| Good Sam Club | 1,222 | 1,470 | 2,338 | 2,660 |
| Subtotal | 1,361,746 | 1,241,654 | 2,327,921 | 2,188,091 |
| Total costs applicable to revenue | 1,383,693 | 1,258,846 | 2,367,589 | 2,220,466 |
| Operating expenses: | | | | |
| Selling, general, and administrative | 437,489 | 419,676 | 824,934 | 791,149 |
| Depreciation and amortization | 23,419 | 20,032 | 45,963 | 39,322 |
| Long-lived asset impairment | — | 4,584 | 620 | 10,411 |
| Lease termination | (107) | 40 | (107) | 40 |
| Loss (gain) on sale or disposal of assets | 1,185 | 7,945 | (638) | 9,530 |
| Total operating expenses | 461,986 | 452,277 | 870,772 | 850,452 |
| Income from operations | 130,269 | 95,382 | 151,111 | 99,604 |
| Other expense: | | | | |
| Floor plan interest expense | (20,989) | (27,799) | (39,295) | (55,681) |
| Other interest expense, net | (30,836) | (36,153) | (61,367) | (72,247) |
| Other expense, net | (2,600) | (81) | (2,758) | (175) |
| Total other expense | (54,425) | (64,033) | (103,420) | (128,103) |
| Income (loss) before income taxes | 75,844 | 31,349 | 47,691 | (28,499) |
| Income tax (expense) benefit | (18,321) | (7,935) | (14,850) | 1,107 |
| Net income (loss) | 57,523 | 23,414 | 32,841 | (27,392) |
| Less: net income (loss) attributable to non-controlling interests | (27,307) | (13,643) | (14,905) | 14,856 |
| Net income (loss) attributable to Camping World Holdings, Inc. | $ 30,216 | $ 9,771 | $ 17,936 | $ (12,536) |

101. The above statements identified in ¶¶72-83, 91-100 were materially false and/or misleading, and failed to disclose material adverse facts related to the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (i) the Company's ability to maximize profits by "surgically manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and (v) that as a result of the foregoing,

Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

**The Truth Starts Emerging as False and Misleading Statements Continue**

*October 28, 2025 Press Release*

102. The truth began to emerge on October 28, 2025, when the Company released its financial results for the third quarter of 2025 ended September 30, 2025, which it also filed on Form 8-K with the SEC (the "Q3 2025 Press Release"). The Form 8-K was signed by Defendant Kirn.

103. The Q3 2025 Press Release stated, *inter alia*, that "new vehicle revenue was $766.8 million for the third quarter, a decrease of $58.1 million, or 7%," that "average selling price of new vehicles sold decreased 8.6%," that "new vehicle gross margin was 12.7%, a decrease of 81 basis points," driven primarily by the "8.6% decrease in the average selling price per new vehicle sold[,]" that "total gross margin was 28.6%, a slight decrease of 27 basis points," primarily attributed to "the reduced average selling price per new vehicle sold[,]" and that the Company saw 2026 as a "consecutive year of Adjusted EBITDA growth, starting in the low $300 million range." The Q3 Press Release stated in relevant part:

**Third Quarter-over-Quarter Operating Highlights**

- Revenue was $1.8 billion for the third quarter, an increase of $81.1 million, or 4.7%

- New vehicle revenue was $766.8 million for the third quarter, a decrease of $58.1 million, or 7.0%, and new vehicle unit sales were 20,286 units, an increase of 343 units, or 1.7%. Used vehicle revenue was $589.1 million for the third quarter, an increase of $141.9 million, or 31.7%, and used vehicle unit sales were 18,694 units, an increase of 4,629 units, or 32.9%. Combined new and used vehicle unit sales were 38,980, an increase of 4,972 units, or 14.6%.

\*   \*   \*

- New vehicle gross margin was 12.7%, a decrease of 81 basis points, driven primarily by the 8.6% decrease in the average selling price per new vehicle sold, partially offset by a 7.8% reduction in the average cost per new vehicle sold. Used vehicle gross margin was 18.3%, an increase of 16 basis points, primarily due to a 1.1% decrease in the average cost per unit sold, partially offset by the 0.9% lower average selling price.

\* \* \*

Gross profit was $517.0 million, an increase of $18.5 million, or 3.7%, and total gross margin was 28.6%, a slight decrease of 27 basis points. The gross profit increase was mainly driven by the $26.7 million higher used vehicle gross profit from the increase in used vehicle unit sales as discussed above and $12.0 million increased finance and insurance, net ("F&I") gross profit largely from the 14.6% increase in combined new and used vehicle unit sales and new F&I offerings. The slight gross margin decrease was primarily from the reduced average selling price per new vehicle sold, which was mostly offset by higher finance and insurance, net revenue that contributes 100.0% gross margin.

104. On this news, Camping World's stock fell $4.17, or 24.8%, from a closing price of $16.82 per share on October 28, 2025 to close at $12.65 per share on October 29, 2025. However, the Individual Defendants continued to obfuscate the truth about the Company's inventory management and the need to implement corrective objectives.

105. For example, in the Q3 2025 Press Release, the Individual Defendants purported to reassure investors that "this judicious conservatism, combined with our fortified balance sheet and improving leverage, has set the stage for our return to measured and accretive M&A activity across the business." The Q3 2025 Press Release stated, in relevant part:

Marcus Lemonis, Chairman and Chief Executive Officer of CWH commented, "As our team prepares for 2026, we are extremely confident in our ability to once again outperform the RV industry, grow our earnings, and continue to reduce our leverage year-over-year. As expected, affordability is still top of mind for consumers, and rising prices could create resistance on demand. This is leading us to deliberately set conservative new volume growth assumptions. Our Company will continue to rely on our market leading used, service, and Good Sam businesses as our financial performance differentiator. *While it is early in our forecasting, we see a consecutive year of Adjusted EBITDA growth, starting in the low $300 million range*, and a plan to outperform it."

Mr. Lemonis concluded, "Our management team believes this *judicious conservatism, combined with our fortified balance sheet and improving leverage, has set the stage for our return to measured and accretive M&A activity across the business*."

***October 29, 2025 Earnings Call***

106. The Company hosted an earnings call October 29, 2025 to discuss the third quarter results (the "Q3 2025 Earnings Call").

107. On the Q3 2025 Earnings Call, despite noting potential internal "delusion about what was happening" with regard to how the Company had historically operated, Defendant Lemonis purported to assure investors that "if you look at the stocking of used, we've become far better at that side of the supply chain[.]" Defendant Lemonis continued on to downplay the significance of further statements by saying "what you're hearing from us today is just a more tempered approach to stocking and to forecasting." Defendant Lemonis's statements on the Q3 205 Earnings Call were, in relevant part:

> It's a little early in the quarter for us to predict where things are going to land. As Matt mentioned earlier, we have seen resistance on the new side. Nothing that alarms us, but it is a resistance where we're starting to comp year-over-year-over-year growth. On the used side, we're continuing to see performance there. *I have sort of laid down the gauntlet with the team on wanting to make sure that we're going into 2026 with, again, clean inventory, no excuses in 2026. So I've been a little bit more aggressive in pushing them to liquidate out of inventory, and that's probably a little dangerous of a word, liquidate, sell-through a little inventory just to make sure we go in a little cleaner*.

*   *   *

> Joe, the one thing that I think Matt and the team have done very well in acknowledging the potential resistance on the new side is, *if you look at the stocking of used, we've become far better at that side of the supply chain*. And part of the really intentional conservatism for '26 is that we really start to build out our cash flow and our inventory positions. And when we think about placing orders 3, 6, 9 months in advance on the new side, it was more judicious for us to build that model with a lower expectation, knowing that if we wanted to take on more new at any time, if we were wrong about our calculus, that would be easy to get inventory. But I think what I really appreciate about our strategy is, if we are right about our

43

strategy, if the new is going to have a little bit of resistance, we're not going to be kicking the can on new aging into the next 12 to 24 months. ***And when we look back on what happened over history, we may have gone into the years with just because we were outperforming everybody else, a little bit of a delusion about what was happening, and we would go for it on the inventory side and then find out 18 months later that we have to discount our way out of stuff. So what you're hearing from us today is just a more tempered approach to stocking and to forecasting and that we know that if we outperform like we always do, it's easy for us to get more inventory.*** It's really hard to get rid of inventory that we miscalculated.

108. The above statements identified in ¶105-107 were materially false and/or misleading, and failed to disclose material adverse facts related to the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (i) the Company's ability to maximize profits by "surgically manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and (v) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

## The Truth Fully Emerges

### *February 24, 2026 Press Release*

109. The truth fully emerged on February 24, 2026 with the release of the Q4 2025 Press Release.

110. The Q4 2025 Press Release revealed that the Company had "implemented strict, corrective inventory management objectives to structurally improve [its] turnover rates" with the expectation of creating "gross margin headwinds in the first half of 2026[.]" The Q4 2025 Press

44

Release reported financial results including "net loss was $(109.1) million for the fourth quarter of 2025, an increased loss of $49.6 million, or 83.3%[,]" that "adjusted EBITDA was $(26.2) million, an increased loss of $23.7 million[,]" that "gross profit was $338.2 million, a decrease of $38.7 million, or 10.3%, and total gross margin was 28.8%, a decrease of 247 basis points."

111. The Q4 2025 Press Release also reported that "new vehicle gross margin was 12.3%, a decrease of 291 basis points," and that "[u]sed vehicle gross margin was 16.0%, a decrease of 277 basis points," primarily attributed to "the 2.5% lower average selling price and the 0.9% increase in the average cost per used vehicle sold, driven in part by accelerated sales of aged used vehicles in December." Additionally, the Q4 2025 Press Release reported SG&A as a percentage of gross profit of 83.1%, representing a 190 basis point year-over-year improvement. This fell significantly short of the Company's previous guidance for 300 to 400 basis point improvement. The Company also indicated that it would be immediately pausing the historically paid quarterly cash dividends to Class A stockholders.

112. The Q4 2025 Press Release stated, in relevant part:

> Mr. Wagner stated, "Early season RV show momentum underscores our confidence in our ability to outpace broader RV unit industry trends and meaningfully grow our Adjusted EBITDA in 2026. To best position our organization for sustained, multi-year growth, *we have implemented strict, corrective inventory management objectives to structurally improve our turnover rates. These actions are expected to result in gross margin headwinds in the first half of 2026*, before providing tailwinds in the second half of the year and beyond."

*     *     *

> **Fourth Quarter-over-Quarter Operating Highlights**
>
> - Revenue was $1.2 billion for the fourth quarter, a decrease of $30.9 million, or 2.6%.
>
> - New vehicle revenue was $457.8 million for the fourth quarter, a decrease of $39.7 million, or 8.0%, and new vehicle unit sales were 10,750 units, a decrease of 825 units, or 7.1%. Used vehicle revenue

45

was $386.5 million for the fourth quarter, an increase of $38.4 million, or 11.0%, and used vehicle unit sales were 12,035 units, an increase of 1,462 units, or 13.8%. Combined new and used vehicle unit sales were 22,785, an increase of 637 units, or 2.9%.

- Average selling price of new vehicles sold decreased 0.9% and average selling price of used vehicles sold decreased 2.5%.

- Same store new vehicle unit sales decreased 5.3% for the fourth quarter and same store used vehicle unit sales increased 14.7%. Combined same store new and used vehicle unit sales increased 4.3%.

- New vehicle gross margin was 12.3%, a decrease of 291 basis points, driven primarily by the 2.5% increase in the average cost per new vehicle sold and the 0.9% decrease in the average selling price per new vehicle sold. Used vehicle gross margin was 16.0%, a decrease of 277 basis points, primarily due to the 2.5% lower average selling price and the 0.9% increase in the average cost per used vehicle sold, driven in part by accelerated sales of aged used vehicles in December.

*     *     *

- Gross profit was $338.2 million, a decrease of $38.7 million, or 10.3%, and total gross margin was 28.8%, a decrease of 247 basis points. The gross profit decrease was mainly driven by the $19.3 million lower new vehicle gross profit, $7,6 million of decreased finance and insurance, net ("F&I") gross profit, $4.1 million of decreased products, service and other gross profit, and $3.5 million of decreased used vehicle gross profit.

*     *     *

- Net loss was $(109.1) million for the fourth quarter of 2025, an increased loss of $49.6 million, or 83.3%. Adjusted EBITDA was $(26.2) million, an increased loss of $23.7 million.

*     *     *

|  | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| ($ in thousands) | 2025 | 2024 | 2025 | 2024 |
| SG&A Excluding SBC: | | | | |
| SG&A | $ 367,277 | $ 367,759 | $ 1,603,222 | $ 1,573,117 |
| SBC - SG&A | (20,698 ) | (5,322 ) | (43,819 ) | (21,213 ) |
| SG&A Excluding SBC | $ 346,579 | $ 362,437 | $ 1,559,403 | $ 1,551,904 |
| As a percentage of gross profit | 102.5 % | 96.2 % | 83.1 % | 85.0 % |

***February 25, 2026 Earnings Call***

113. Then on the morning of February 25, 2026, the Company hosted an earnings call to discuss the financial results for the fourth quarter and full 2025 fiscal year (the "Q4 2025 Earnings Call").

114. During the Q4 2025 Earnings Call, Defendant Wagner acknowledged a shared belief that the "decision to accelerate the cleansing of [the Company's] inventory" will "negatively impact EBITDA by about $35 million in 2026[.]"Defndant Wagner's statements on the Q4 2025 Earnings Call included the following, in relevant part:

> By improving our inventory turnover rate, we will increase working capital efficiency with fresher inventory. To put it even more simply, we will do more with less and position ourselves to generate higher revenue and greater earnings power with less inventory. ***This will require a strict and at times, aggressive approach to move through certain aged and noncore RV assets. While this strategy is essential to reset our foundation and enhance future cash flows, we expect it will create a near-term negative impact on our gross profit per unit for both new and used vehicles***. This proactive strategy is a key driver behind our outlook for the year. During our Q3 call, we set a minimum expectation of $310 million in adjusted earnings for 2026. ***Given our decision to accelerate the cleansing of our inventory, we believe this strategy could negatively impact EBITDA by about $35 million in 2026, particularly in the front half of the year***.

115. Defendant Kirn also admitted that one of the largest "drivers of the delta in our fourth quarter results versus our own expectations" was "the December hit to vehicle margins as we accelerated the cleansing of our inventory[.]" Defendant Kirn's statements on the Q4 2025

Earnings Call were as follows, in relevant part:

> As we think about the drivers of the delta in our fourth quarter results versus our own expectations, **the largest was the December hit to vehicle margins as we accelerated the cleansing of our inventory,** along with dealer insurance product cancellation reserves. Our 2026 guidance calls for adjusted EBITDA in the range of $275 million to $325 million, with just over 50% of the annual adjusted EBITDA expected to occur in the first half of the year.

116.    On this news, Camping World's stock fell $1.79, or 16.5%, from a closing price of $10.85 per share on February 24, 2026 to close at $9.06 per share on February 25, 2026.

## DAMAGES TO CAMPING WORLD

117.    As a direct and proximate result of the Individual Defendants' conduct, Camping World will lose and expend many millions of dollars.

118.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its former CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

121.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties

to the Company, including lucrative insider trading conducted by six of the Individual Defendants.

122. As a direct and proximate result of the Individual Defendants' conduct, Camping World has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

123. Plaintiff brings this action derivatively and for the benefit of Camping World to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, and/or officers of Camping World, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

124. Camping World is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125. Plaintiff is, and has been at all relevant times, a shareholder of Camping World. Plaintiff will adequately and fairly represent the interests of Camping World in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

127. A pre-suit demand on the Board of Camping World is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Baltins,

Cassidy, George, Lane, Malone, Moody, Schickli, and Wagner (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants who are on the Board at the time this action is commenced.

128. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130. As Board members of the Company, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of the Company, the Director-Defendants must have been aware of the material facts regarding the Company's data analytics capabilities as well as its experienced and expected retail demands.

131. Additional reasons that demand on Defendant Baltins is futile follow. Defendant Baltins has served as a Company director since 2016. He also serves as the Chair of the

Compensation Committee and as a member of the Nominating and Corporate Governance Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Baltins solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Baltins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132. Additional reasons that demand on Defendant Cassidy is futile follow. Defendant Cassidy has served as a Company director since 2016. He also serves as a member of the Compensation Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Cassidy solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Lemonis Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Cassidy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore,

excused.

133. Additional reasons that demand on Defendant George is futile follow. Defendant George has served as a Company director since January 2017. She also serves as a member of the Compensation Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant George solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant George breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134. Additional reasons that demand on Defendant Lane is futile follow. Defendant Lane has served as a Company director since March 2024. She also serves as a member of the Audit Committee. She has received and continues to receive handsome compensation for her role at the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Lane solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant

Lane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Malone is futile follow. Defendant Malone has served as a Company director since May 2019. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Malone solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Cassidy and Lemonis to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Malone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additional reasons that demand on Defendant Moody is futile follow. Defendant Moody is the Chairman of the Board and has served as a Company director since May 2018. Defendant Moody previously worked for Camping World since 2002, most recently serving as President of the Company from September 2018 to June 2024. . As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Moody solicited the 2025 Proxy Statement, which contained material

misrepresentations and omissions and contributed to, *inter alia*, the re-election of Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Moody breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Schickli is futile follow. Defendant Schickli has served as a Company director since 2016. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Schickli solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Schickli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on Defendant Wagner is futile follow. Defendant Wagner has served as CEO of the Company and as a Company director since January 2026. He has also been the President of the Company since July 2024. Previously, Defendant Wagner served various roles at the Company dating back to 2007. The Company provides Defendant Wagner with his principal occupation for which he receives handsome compensation. Thus, as the Company

admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Wagner is also named as a defendant in the Securities Class Action. For these reasons, Defendant Wagner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on the Board is futile follow.

140. Defendants Malone (as Chair), Schickli, and Lane (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

141. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The

Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

142. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

143. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

144. The acts complained of herein constitute violations of fiduciary duties owed by Camping World's officers and directors, and these acts are incapable of ratification.

145. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Camping World. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Camping World, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

146. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Camping World to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

147. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli for Violations of Section 14(a) of the Securities Exchange Act of 1934**

148. Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

149. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

150. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

151. Under the direction and watch of the Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli, the 2025 Proxy Statement failed to disclose that: (i) the Company's ability to maximize profits by "surgically manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and (v) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

152. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

153. In the exercise of reasonable care, Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement at the Company's Annual Meeting of shareholders on May 15, 2025, including election of directors.

154. As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted to, *inter alia*, re-elect Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to Camping World.

155. The Company was damaged as a result of Defendants Lemonis, Baltins, Cassidy, George, Lane, Malone, Moody, and Schickli's material misrepresentations and omissions in the 2025 Proxy Statement.

156. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

157. Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

158. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Camping World's business and affairs.

159. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

160. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Camping World.

161. In breach of their fiduciary duties owed to Camping World, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's ability to maximize profits by "surgically manag[ing] [its] inventory" through "data analytics" was overstated; (ii) the actual and expected retail demand of consumers as reported by the Company was inflated; (iii) as a result of the foregoing, the Company would require "strict, corrective inventory management objectives" expected to negatively impact gross profit and margins as a result; (iv) the Company implemented inadequate systems and processes to ensure reasonably accurate disclosures and/or guidance; and (v) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a material basis.

162. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company

for breaching their fiduciary duties.

163. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

164. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Camping World's securities.

165. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Camping World's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

166. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Camping World has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

169. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Camping World.

171. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Camping World that was tied to the performance or artificially inflated valuation of Camping World, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

172. Plaintiff, as a shareholder and a representative of Camping World, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## FOURTH CLAIM

**Against Individual Defendants for Abuse of Control**

174. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Camping World, for which they are legally responsible.

176. As a direct and proximate result of the Individual Defendants' abuse of control, Camping World has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## FIFTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

178. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Camping World in a manner consistent with the operations of a publicly held corporation.

180. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Camping World has sustained and will continue to sustain significant damages.

181. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

183. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

185. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Camping World to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

186. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Wagner, Lemonis, and Kirn for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

188. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

189. Camping World, Defendant Wagner, Defendant Lemonis, and Defendant Kirn are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Wagner's, Lemonis', and Kirn's willful and/or reckless violations of their

obligations as officers and/or directors of Camping World.

190. Defendants Wagner, Lemonis, and Kirn, because of their positions of control and authority as CEO, former CEO, and CFO, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Camping World, including the wrongful acts complained of herein and in the Securities Class Action.

191. Accordingly, Defendants Wagner, Lemonis, and Kirn are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192. As such, Camping World is entitled to receive all appropriate contribution or indemnification from Defendants Wagner, Lemonis, and Kirn.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Camping World, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Camping World;

(c) Determining and awarding to Camping World the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Camping World and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Camping World and its shareholders from a repeat of

the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Camping World to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Camping World restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 20, 2026                    Respectfully submitted,

*/s/ Timothy Brown*
Timothy Brown
**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

66

*Counsel for Plaintiff*

Docusign Envelope ID: 54078009-D5BC-86E9-8283-118820C6AD61

**VERIFICATION**

I, Merry A. Kogut, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of May 2026.

DocuSigned by:

*Merry A. Kogut*

163A348D2BC4477...

Merry A. Kogut